RENDERED:  JULY 2, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1222-MR

SADIKI ROGER                                                           APPELLANT

v.
APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE JENNIFER WILCOX, JUDGE
ACTION NO. 22-CR-002128

COMMONWEALTH OF KENTUCKY                                               APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  A. JONES, KAREM, AND MOYNAHAN, JUDGES.

MOYNAHAN, JUDGE:  Appellant Sadiki Roger was convicted of first-degree rape at trial in the Jefferson Circuit Court.  On appeal, he contends: (1) his statement to police was not knowingly and intelligently made, and (2) admission of irrelevant and prejudicial evidence denied him a fair trial.  For the following reasons we affirm.

# BACKGROUND

On August 27, 2022, around 7:00 p.m., Roger and another man went to an apartment in search of Roger's friend Frederick. Residing in the apartment at the time were Frederick, his family, and another family consisting of L.O., her husband Israel, and their infant child. When Roger arrived, L.O. was home alone with the baby while Israel was attending a concert. Roger waited inside the apartment for Frederick to return while the other man departed. The parties' accounts of the events that follow then diverge significantly.

Roger contends that L.O. initiated sexual advances towards him, removed her clothing, and pulled him toward her. He claimed that he told her he was not interested in having sex with a married woman, but that he "fell on top of her," and the two engaged in what he described as "brief intercourse" lasting approximately two minutes, during which he ejaculated. He reported leaving the apartment afterward, standing behind a tree to "contemplate what happened," and then returning to the apartment despite seeing that Israel had come home. Upon his return, L.O. accused him of rape, and Israel physically assaulted him before calling the police.

L.O. provided a markedly different account. She testified that she did not know Roger and after the other man left, Roger began asking about her husband's whereabouts and commented that Israel "must not love her" if he left

her alone. L.O. stated that Roger began touching her without consent, prompting her to retreat to the bedroom, where her phone was charging, to call Israel. The couple's infant child was asleep in the bedroom at the time. Israel instructed her not to let Roger leave and said that he was returning home. L.O. returned to the living room, where she testified that Roger grabbed her, pushed her onto the couch, held her down, threatened to kill her if she screamed, put a hand over her mouth, and forcibly raped her. She reported that he ejaculated inside her and then told her to clean herself and not to disclose what had occurred. According to L.O., Roger left but returned sometime later. Israel arrived home shortly thereafter, physically confronted Roger, and contacted law enforcement around 10:40 p.m.

Both L.O. and Roger were transported to the hospital. L.O. underwent a sexual assault examination, which revealed genital lacerations as well as DNA from both Roger and Israel; L.O. reported having had consensual intercourse with Israel earlier that day. Roger was treated for injuries to his head, back, and wrists consistent with the altercation with Israel. He received four staples to close a "small laceration" on his head.

At approximately 4:12 a.m. on August 28, 2022, Detective Cockerel, of the Louisville Metro Police Department ("LMPD"), advised Roger of his *Miranda*[1] rights in English during a recorded interview. After the warnings were

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

read, Roger indicated he did not understand and requested the assistance of a Swahili interpreter. An interpreter was contacted and participated in the interview via speakerphone. Together, Detective Cockerel and the interpreter recited each *Miranda* right, with Roger affirming his understanding after each item. They then conveyed the waiver of these rights to Roger, who appeared to pause before responding. Following an exchange between Roger and the interpreter,[2] the interpreter indicated that Roger understood his rights and wished to speak to Detective Cockerel. Roger moved to suppress his statement on the grounds that his minor head injury and exhaustion rendered any waiver involuntary.[3] The trial court denied the motion.

Additionally, before trial, Roger moved to exclude evidence that L.O. had undergone a cesarean section ("C-section") approximately two months before the alleged assault, arguing that the evidence was irrelevant and prejudicial. The Commonwealth opposed the motion, asserting that Roger's consent defense—specifically his claim that L.O. initiated the encounter—placed her physical

---

[2] Although we cannot independently verify the precise content of the exchange due to the language barrier, based on the audio, the interpreter appears to have repeated the waiver in response to what sounded like Roger's request for clarification.

[3] Roger concedes that the issue of his blood alcohol content (0.171, as measured at the hospital two hours before his LMPD interview) was never raised during the suppression hearing or in post-suppression briefing. Because intoxication was not presented as a suppression basis, and the trial court was never asked to evaluate it or make findings related to it, the issue is properly deemed to have been waived. *See Oakley v. Oakley*, 391 S.W.3d 377, 380 (Ky. App. 2012) ("[A]n appellate court cannot consider items that were not first presented to the trial court.").

condition at issue and made the evidence probative of whether she was likely to have been the sexual aggressor.  The trial court denied the motion and permitted the Commonwealth to introduce the evidence.

The jury ultimately convicted Roger of first-degree rape, and the trial court sentenced him to ten years' imprisonment, with credit for time served.  Roger raises the following arguments on appeal:  (1) his *Miranda* waiver was invalid because it was not made knowingly and intelligently, and (2) admission of irrelevant and prejudicial evidence regarding L.O.'s recent C-section denied him a fair trial.

## STANDARD OF REVIEW

On appeal, suppression rulings are reviewed under a two-part standard.  *Osborne v. Commonwealth*, 718 S.W.3d 622, 627 (Ky. 2025).  First, we "defer to the trial court's factual findings if they are supported by substantial evidence and only review such findings for clear error[s.]"  *Bond v. Commonwealth*, 453 S.W.3d 729, 732 (Ky. 2015) (citations omitted).  Second, the trial court's application of the law to the particular facts of the case is reviewed *de novo*.  *Id.  See also Osborne*, 718 S.W.3d at 627.  When reviewing the application of the law to the facts, "we take care to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."  *Bond*, 453 S.W.3d at 732 (internal quotation marks and citation omitted).

"The task of weighing the probative value and undue prejudice of proffered evidence is inherently factual and, therefore, within the discretion of the trial court." *Burdette v. Commonwealth*, 664 S.W.3d 605 (Ky. 2023) (citing *Ross v. Commonwealth*, 455 S.W.3d 899, 910 (Ky. 2015)); *see* KRE[4] 403. As such, rulings on admissibility of evidence are reviewed for abuse of discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). A trial court abuses its discretion when its decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Id.*; *see also Lopez v. Commonwealth*, 459 S.W.3d 867, 872-73 (Ky. 2015).

Not every error warrants action on the reviewing court's part. "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties." *Ward v. Commonwealth*, 587 S.W.3d 312, 331 (Ky. 2019) (quoting RCr[5] 9.24). Consequently, "[a] nonconstitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Mason v. Commonwealth*, 559 S.W.3d 337, 339-40 (Ky. 2018) (citations omitted). Where there is a constitutional error, prejudice is presumed, *Ellis v. Commonwealth*, 694 S.W.3d 294, 304 (Ky. 2024)

---

[4] Kentucky Rules of Evidence.

[5] Kentucky Rules of Criminal Procedure.

(citation omitted), but "[r]eversal is not required if the error complained of is harmless beyond a reasonable doubt." *Dillon v. Commonwealth*, 475 S.W.3d 1, 15 (Ky. 2015) (citations omitted); *see also Nunn v. Commonwealth*, 461 S.W.3d 741, 750 (Ky. 2015).

## ANALYSIS

**A. The *Miranda* Waiver Was Knowing and Voluntary**.

Roger contends that the trial court erred in denying his motion to suppress, asserting that his waiver of *Miranda* rights was ineffective. To be effective, a waiver must be made "voluntarily, knowingly and intelligently." *Dillon*, 475 S.W.3d at 13 (citing *Miranda*, 384 U.S. at 444). Determining the validity of a *Miranda* waiver is a two-part inquiry, of which each part must be shown by a totality of the circumstances. *Dillon*, 475 S.W.3d at 13. "First, the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks and citations omitted).

In assessing Roger's motion to suppress, the trial court made several factual findings which were supported by substantial evidence. The rape took place sometime around 7:00 p.m. or 8:00 p.m., though police were not called until

around 10:40 p.m. Additionally, it found that Detective Cockerel arrived and began interrogating Roger around 4:12 a.m. After a short introduction in English, Cockerel began reading Roger his rights, at which time Roger asked for an interpreter. A Swahili interpreter was found, who was then conferenced in by phone and assisted in advising Roger regarding his rights. Following the interpreter's involvement, Roger acknowledged that he understood his rights.

To these facts, we now apply the two-part *Miranda* waiver analysis *de novo*. The voluntariness component of the *Miranda* waiver test is readily satisfied on this record. There is no indication of coercive police activity, and Roger does not seriously contend otherwise. Thus, the remaining question is whether Roger knowingly and intelligently waived his *Miranda* warnings. Roger contends that the laceration to his head, in addition to alleged sleep deprivation, rendered his waiver unknowing and unintelligent.

To properly evaluate whether the accused understood the nature of his rights and the consequences of abandoning them, "we must consider the totality of the 'particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" *Cox*, 641 S.W.3d at 114. (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). Upon initial questioning, Roger provided his name and address in English without difficulty. Through the interpreter, Roger indicated his understanding of each right *as it was read* and

acknowledged the consequences of waiving these rights before agreeing to speak with Cockerel. Taken together, these facts demonstrate that, under the totality of the circumstances, Roger knowingly and intelligently waived his rights.

Roger's reliance on *Dillon* is unavailing. In *Dillon*, the defendant shot and killed his girlfriend before turning the gun on himself. *Dillon*, 475 S.W.3d at 4. Officers found the assailant with a gunshot wound to the top of his head – the entry wound inside his mouth. *Id.* at 5. He had to be propped up by officers to prevent him from choking on his own blood and enable him to speak. *Id.* After calling emergency services, an officer asked the defendant his name, to which he responded verbally. *Id.* Every question thereafter was a short yes or no question to which the defendant responded by nodding. *Id.* The Kentucky Supreme Court held that while the defendant's statements were voluntary, there was insufficient evidence to find that the waiver was knowing and intelligent. *Id.* at 14. It held that there must be evidence a defendant has "full awareness" of the right to remain silent and the "consequences" of waiving it. *Id.* at 15. The defendant in *Dillon* failed this threshold because there was no indication he was capable of cognitively integrating the rights articulated to him in a way that would have allowed him to realize their significance. *Id.*

In stark contrast, here Roger was not seriously injured, and quite readily and actively engaged in conversation with Detective Cockerel. While

Roger did have a "small laceration" on his head, his pain was treated with Tylenol. There is no indication that Roger failed to understand the nature of his rights or the consequences of waiving them.[6] To the contrary, he affirmatively acknowledged his understanding after each right was read and indicated that he understood the waiver and wished to speak with Detective Cockerel.

Roger's claim now that exhaustion undermined the knowing and intelligent nature of his Miranda waiver is unpersuasive. While a defendant's level of fatigue may be relevant to the voluntariness inquiry where law enforcement employs coercive tactics,[7] it carries little weight outside that context. Sleepiness does not make one incoherent or deprive a defendant of the ability to make rational choices. *See Chapman v. Commonwealth*, No. 2003-SC-0512-MR, 2004 WL 2364401, at *2 (Ky. Oct. 21, 2004); *see also Brock v. Commonwealth*, No. 2022-

---

[6] As previously noted, to the extent Roger suggests that intoxication affected the validity of his waiver, that argument was not preserved for review. In any event, Kentucky courts have consistently held that intoxication will not render a statement unknowing or unintelligent unless the accused was intoxicated to the point of mania or was hallucinating, functionally insane, or otherwise unable to understand the meaning of his statements. *Smith v. Commonwealth*, 410 S.W.3d 160, 164 (Ky. 2013) (internal quotation marks and citations omitted). Nothing in the record, which includes the recorded interview, suggests that Roger's level of intoxication approached that standard. Even if considered alongside the other factors, its contribution would not satisfy the threshold for an ineffective waiver.

[7] *See Greenwald v. Wisconsin*, 390 U.S. 519, 519-21 (1968) (per curiam) (confession obtained from defendant with ninth grade education, who was questioned without *Miranda* warnings for over eighteen hours and was prevented from eating, sleeping, and taking his medication, deemed involuntary); *Clewis v. Texas*, 386 U.S. 707, 709-10 (1967) (confession resulting from nine-day interrogation with inadequate food and sleep deemed involuntary).

-10-

SC-0147-MR, 2024 WL 5179093, at *8 (Ky. Dec. 19, 2024) (appearing sleepy or yawning not sufficient to make a waiver involuntary).[8] Roger was not forced to remain awake and nothing in the record suggests drowsiness impacted his decision to waive his rights and respond to Detective Cockerel's questioning.

### *Any Error Was Harmless Beyond a Reasonable Doubt*

Even if Roger's waiver was ineffective, any error in admitting the statement was harmless beyond a reasonable doubt. Harmless error applied to constitutional errors "involves considering the improper evidence in the context of the entire trial and asking whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Ellis*, 694 S.W.3d at 302 (internal quotation marks and citations omitted).

Despite finding error in admitting the statement in *Dillon*, our Supreme Court nonetheless held that the error was harmless beyond a reasonable doubt. *Dillon*, 475 S.W.3d at 15. Part of its reasoning was that the only incriminating statement Dillon made was that he "killed" the victim, but he never denied that fact at trial. *Id.* Indeed, he claimed the entire incident was an accidental self-defense shooting. *Id.* at 7. Crucially, in his statements, he never admitted to the *mens rea* for murder, the crime for which he was charged. *Id.* at

---

[8] Pursuant to Kentucky Rules of Appellate Procedure ("RAP") 41 opinions designated "Not to be Published" are non-binding. We cite to them persuasively.

15. Thus, the statements he made were not inconsistent with his trial defense and, standing alone, their admission did not warrant reversal. *Id.*; *cf. Ellis*, 694 S.W.3d at 303 (in a largely circumstantial case, admission of defendant's remarks that were "as close as you can get to a confession without confessing" was not harmless beyond a reasonable doubt).

Here, as in *Dillon*, even if Roger's statements were erroneously admitted, they were harmless beyond a reasonable doubt. In his interview, Roger claimed the encounter with L.O. was consensual. While he did acknowledge sexual intercourse occurred – a fact that later DNA evidence would confirm – he never admitted to forcible rape or any other manner of coercion that would constitute criminal liability. Further, Roger's statements did not serve as the primary evidence against him and the prosecution presented substantial physical and testimonial evidence apart from those statements.

**B. The Trial Court Properly Admitted Evidence of Victim's C-Section**.

Roger argues that the trial court erred in denying his pretrial motion in *limine* to exclude evidence. Prior to trial, Roger moved to prevent the Commonwealth from introducing evidence related to the fact that the victim had a C-section on July 6, 2022, arguing that it was not relevant, and, alternatively, to the extent it had any marginal relevance, it should be excluded as unduly prejudicial under KRE 403. The Commonwealth responded that the C-section was relevant to

-12-

refute Roger's assertion that the sexual encounter was consensual and to call his account of the events leading up to the alleged assault into question.[9] Roger's counsel responded that the Commonwealth's proffered explanation did not hold up because the victim herself informed hospital staff that she had engaged in consensual sex with her husband close in time before the alleged rape. The trial court stated that it agreed with the Commonwealth that the C-section was relevant and denied Roger's motion.

For evidence to be relevant, it must make the existence of any fact at issue more or less probable. *English*, 993 S.W.2d at 944. However, under KRE 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. Unduly prejudicial evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case[.]" *Richmond v. Commonwealth*, 534 S.W.3d 228, 232 (Ky. 2017) (quoting *Butler v. Commonwealth*, 367 S.W.3d 609, 615 (Ky. App. 2012)) (internal quotation marks omitted). When reviewing a trial court's

---

[9] Although the Commonwealth's argument was not overly explanatory, the gist was that since the victim was recovering from surgery it was unlikely that she would have initiated sex in the manner described by Roger (removing her clothes and pulling Roger toward her).

-13-

balancing under KRE 403 for abuse of discretion, we must "view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Commonwealth v. Melton*, 670 S.W.3d 861 (Ky. 2023) (quoting *Major v. Commonwealth*, 177 S.W.3d 700, 707 (Ky. 2005)); *see also Burdette*, 664 S.W.3d at 617.

The trial court did not err in admitting evidence that L.O. had undergone a C-section approximately two months before the assault. There was no testimony by the victim that she was still actively recovering from the C-section at the time of the alleged rape, that due to the C-section she was still under doctor's orders not to engage in sex, or that the C-section would have made it difficult or impossible for her to initiate the sexual encounter as described by Roger. However, in Roger's version of events, as conveyed in his LMPD interview, L.O. was the sexual aggressor who initiated the interaction. Indeed, Roger claimed that L.O. *pulled him* on top of her. This clearly put L.O.'s physical condition at issue – making her C-section surgery relevant as background information for the Commonwealth to present. L.O.'s physical condition was also relevant as a consideration of her ability to resist what she recounted as a non-consensual sexual assault. Thus, the C-section was simply admitted as background information about the victim.

-14-

The C-section evidence was also not unduly prejudicial. Roger did not object to the jury learning of L.O.'s recent delivery, but just to the fact that the delivery involved a C-section. Yet, C-sections are commonplace medical procedures and do not carry the sort of emotional charge that risks overwhelming a jury's reason. *Wheeler v. Commonwealth*, 121 S.W.3d 173, 181 (Ky. 2003) (Evidence that capital murder victim was pregnant was "not sensational or shocking or prejudicial or likely to induce any undue sympathy."). The manner of L.O.'s delivery had probative value, and that value was not substantially outweighed by any prejudice the jury might have felt from knowing it was a C-section birth.

Moreover, Roger's argument primarily concerns what the Commonwealth argued about the C-section in its opening and closing statements. However, Roger neither objected to the arguments of counsel during the trial nor alleged prosecutorial misconduct as part of this appeal. "[A] reviewing court will generally confine itself to errors pointed out in the briefs and will not search the record for errors." *Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App. 1979). Even if properly presented, "[t]he longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom." *Murphy v. Commonwealth*, 509 S.W.3d 34, 50 (Ky. 2017). Here, the Commonwealth's argument essentially boiled down to this: Roger's account was

implausible because it was unreasonable to believe that a new mother who was home alone with an infant and only a few weeks removed from a C-section would aggressively initiate sex with a complete stranger.  Such an argument was not beyond the pale of reasonable inference.

## CONCLUSION

For the foregoing reasons, the trial court is AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Erin Hoffman Yang
Louisville, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Ken W. Riggs
Assistant Attorney General
Frankfort, Kentucky